1998 ND 174

David LINDELL, Claimant and Appellant,

v.

NORTH DAKOTA WORKERS COMPENSATION BUREAU, Appellee.

and

TranSystems, Inc., Respondent and Appellee.

Civil No. 970353.

Supreme Court of North Dakota.

Sept. 29, 1998.

Kevin J. Chapman, of Winkjer McKennett Stenehjem Reierson & Forsberg, Williston, for claimant and appellant.

Lawrence E. King, Special Assistant Attorney General, Bismarck, for appellee North Dakota Workers Compensation Bureau.

Charles A. Stock, of Vogel, Kelly, Knutson, Weir, Bye & Hunke, Fargo, for respondent and appellee TranSystems, Inc.

VANDE WALLE, Chief Justice.

[¶ 1] David Lindell appealed from a judgment affirming a Workers Compensation Bureau order denying his request for disability benefits. We conclude the Bureau did not err in deciding Lindell failed to satisfy the disability verification requirements under N.D.C.C. § 65–05–08.1. We, therefore, affirm the judgment.

[¶ 2] On January 24, 1994, Lindell was employed as a truck driver with TranSystems, Inc. He injured his right shoulder and left hip that day when he slipped and fell on ice while performing a safety check on his beet-hauling truck at the American Crystal Sugar plant in Drayton. On February 8, 1994, Dr. Kauko Jantunen diagnosed Lindell with a "contusion" to his right shoulder and left hip, and estimated Lindell would miss work for five to seven days. After missing only three days of work, Lindell continued driving truck for TranSystems for the final 18 days of the 1994 beet-hauling season.

[¶ 3] Lindell applied for workers compensation benefits on February 18, 1994. The Bureau eventually accepted liability for Lindell's medical bills. No disability benefits were then awarded because Lindell had not

requested any and there was no period of disability beyond five days.

[¶ 4] During May 1994, Lindell worked as a truck driver for Power Fuels, Inc., but left the company because of discomfort in his right arm and shoulder. Lindell also attempted to work as a cement truck driver in June 1994, but again left that employment because of pain in his right arm. During August 1994, Lindell worked as a truck driver for Sundhagen Construction, but left in September 1994 so he could return to work as a driver for TranSystems. Lindell left TranSystems after only a few days of work because other truck drivers and personnel ridiculed him when the pain in his arm prevented him from completely dumping the beets from the bed of his truck. Lindell tried to drive truck for various other companies until May 1995, but each time could not do so because of the pain in his shoulder.

[¶ 5] In June 1995, Lindell requested disability benefits and "back pay" from the Bureau. Lindell told the Bureau he had not suffered any new injury, but his injury had been "constant" since January 1994. Lindell also sought additional medical treatment. Dr. Jantunen referred Lindell to Dr. Paul MacLeod, an orthopedic specialist, who obtained an MRI to assess the problem with Lindell's right arm. After the MRI, Dr. MacLeod believed Lindell had "tendinitis," and prescribed anti-inflammatories and cortisone injections for treatment.

[¶ 6] Between the January 1994 work injury and Lindell's June 1995 request for disability benefits, Lindell, his wife, and their four children received Aid to Families with Dependent Children (AFDC) benefits through Williams County Social Services because Lindell was considered an "unemployed parent." The family also received Medicaid coverage that paid for substantial medical care needed by Lindell's wife and some of their children.

[¶ 7] On February 14, 1996, the Bureau ordered payment of the reasonable medical expenses for treatment of Lindell's January 1994 work injury, but denied his request for disability benefits. Lindell requested a formal hearing.

[¶ 8] Following the hearing, the Administrative Law Judge (ALJ) recommended findings of fact, conclusions of law, and an order affirming the Bureau decision. The ALJ concluded the greater weight of the evidence showed Lindell did not furnish the Bureau with medical verification satisfying the requirements of § 65–05–08.1 for disability eligibility. The ALJ found Lindell did not claim disability benefits before June 1995 because his family had been eligible for Medicaid and Lindell believed workers compensation disability benefits would disqualify them from eligibility for Medicaid. The ALJ concluded Lindell deliberately chose to not seek disability benefits between the date of injury in January 1994 and June 1995, and thereby "voluntarily waived any claim for Workers Compensation disability benefits for that same period that his household was eligible for AFDC/Medicaid benefits."

[¶ 9] The Bureau adopted the ALJ's recommended findings and conclusions, and issued an order denying disability benefits. The district court affirmed the Bureau's order, and Lindell appealed to this Court.

■ [¶ 10] On appeal, we review the Bureau's decision, not the district court's decision, and we affirm unless the findings of fact are not supported by a preponderance of the evidence, the conclusions of law are not supported by the findings of fact, the decision is not supported by the conclusions of law, the decision is not in accordance with the law or violated the appellant's constitutional rights, or the agency's rules or procedures deprived the appellant of a fair hearing. *See Sprunk v. North Dakota Workers Compensation Bureau*, 1998 ND 93, ¶ 4, 576 N.W.2d 861; N.D.C.C. §§ 28–32–19 and 28–32–21. As we said in *Feist v. North Dakota Workers Compensation Bureau*, 1997 ND 177, ¶ 8, 569 N.W.2d 1, our review of the Bureau's findings of fact is limited to determining if it reasonably could have determined the findings were proved by the weight of the evidence from the entire record.

[¶ 11] The first four subsections of N.D.C.C. § 65–05–08.1 (1995) require certain

information to verify disability: [1]

1. The claimant's doctor shall certify the period of temporary total disability upon request of the bureau.
2. A doctor certifying disability shall include in the report filed with the bureau:
   a. The medical basis established by medical evidence supported by objective medical findings for the certification of disability;
   b. Whether the employee is totally disabled, from any and all employment, or whether the employee is able to return to some employment, including light work or sedentary work;
   c. If the employee is not totally disabled, a statement of the employee's restrictions and physical limitations; and
   d. A professional opinion as to the expected length of, and reason for, the disability.
   e. A doctor may not certify or verify past disability unless the doctor has examined the employee within the previous sixty days and filed those reports required by this title.
3. The report must be filed on a form furnished by the bureau, or on any other form acceptable to the bureau.
4. The claimant shall ensure that the required reports are filed.

[¶ 12] Lindell argues the Bureau erred in applying the requirements of N.D.C.C. § 65–05–08.1 (1995) to his initial claim for disability because the statute applies only to the Bureau's termination of disability after those benefits have been awarded.

[¶ 13] For this position, Lindell relies on this Court's statement in *Frohlich v. North Dakota Workers Compensation Bureau*, 556 N.W.2d 297, 302 (N.D.1996), that "NDCC 65–05–08.1 is obviously intended to implement those pretermination protections and to prevent gaps in a claimant's medical record through updated medical reports about the duration of a claimant's disability." *Frohlich*

and our other prior cases interpreting this statute have arisen in the context of Bureau efforts to terminate disability benefits a claimant is already receiving. *See, e.g., Flink v. North Dakota Workers Compensation Bureau*, 1998 ND 11, 574 N.W.2d 784; *Nemec v. North Dakota Workers Compensation Bureau*, 543 N.W.2d 233 (N.D.1996). However, we do not believe the statute is limited to cases involving termination of benefits.

[¶ 14] N.D.C.C. Chapter 65–05 applies to claims and compensation in general. Subsections 5 and 6 of N.D.C.C. § 65–05–08.1 (1995) specifically require pretermination notice to a claimant of the Bureau's decision to terminate ongoing disability benefits, and that requirement was under consideration in *Flink, Frohlich* and *Nemec*. There is no language in the statute indicating a legislative intention to limit application of subdivisions a through d of N.D.C.C. § 65–05–08.1(2) (1995) to termination of ongoing disability benefits, and Lindell has not suggested a plausible reason for so limiting the statute. We conclude subdivisions a through d of N.D.C.C. § 65–05–08.1(2) (1995) do apply to a claimant's initial request for disability benefits.

[¶ 15] A claimant must prove by a preponderance of the evidence eligibility for disability benefits. *See Rooks v. North Dakota Workers' Compensation Bureau*, 506 N.W.2d 78, 80 (N.D.1993). To be eligible for disability benefits, the claimant's doctor must verify disability in a "report" filed with the Bureau. N.D.C.C. § 65–05–08.1(2) (1995). The certifying doctor's report must first include "[t]he medical basis established by medical evidence supported by objective medical findings for the certification of disability." N.D.C.C. § 65–05–08.1(2)(a) (1995). The ALJ found this requirement was satisfied by Dr. MacLeod's November 20, 1995 letter to the Bureau stating "[a]s for the objective findings, the patient seemed to respond to cortisone injections. We have obtained an MRI that demonstrates tendinitis involving his right shoulder and he has find-

---

1. N.D.C.C. § 65–05–08.1 was amended by the Legislature in 1997. *See* 1997 N.D. Sess. Laws Ch. 542, § 2. We confine our analysis to former N.D.C.C. § 65–05–08.1 (1995) that was in effect when the Bureau denied Lindell disability benefits.

ings on the exam consistent with tendinitis in that he had a positive impingement test and he was tender subacromially." However, the ALJ concluded Lindell satisfied none of the other statutory requirements. We agree.

[¶ 16] As to those other requirements, we reject Lindell's argument a physician's "report" under the statute includes not only a physician's formal correspondence with the Bureau, but also any attached office notes or medical records and that the Bureau may find those requirements satisfied in those notes and records. Although we have often said the Bureau must consider the entire medical record in evaluating a claim for benefits, *see, e.g., McDaniel v. North Dakota Workers Compensation Bureau,* 1997 ND 154, ¶ 17, 567 N.W.2d 833, we have not held the Bureau must scour medical reports in search of any evidence that arguably might support a claim for benefits. The express terms of N.D.C.C. § 65–05–08.1 (1995) militate against Lindell's proposed construction of the statute. The statute requires the claimant's doctor to "certify" the period of disability and to include in a "report" to the Bureau the matters enumerated in the statute. N.D.C.C. § 65–05–08.1(1) and (2) (1995). The statute further specifies the report "must be filed on a form furnished by the bureau, or on any other form acceptable to the bureau."[2] N.D.C.C. § 65–05–08.1(3) (1995). In this case, Dr. MacLeod's November 20, 1995 letter to the Bureau, along with physician office notes and medical records, was not a "form" acceptable to the Bureau.

[¶ 17] Adopting Lindell's interpretation of the statute would disserve the claimant as well as the Bureau. The Bureau would be disserved by being required to search through what could be voluminous, ambiguous records to determine whether the requisite information arguably has been provided, and the claimant would be disserved by the time it would take the Bureau to respond to the claim as a result of that

search. We have said "[j]udges, whether trial or appellate, are not ferrets, obligated to engage in unassisted searches of the record for evidence to support a litigant's position." *Anderson v. A.P.I. Co. of Minnesota,* 1997 ND 6, ¶ 25, 559 N.W.2d 204. In view of the requirements of N.D.C.C. § 65–05–08.1 (1995), we think the Legislature did not intend the Bureau be ferrets either.

[¶ 18] Here, Dr. MacLeod's November 20, 1995 letter to the Bureau states in its entirety:

> This letter is in response to your request for more information on David Lindell, dated September 7, 1995. In that letter you would appreciate my objective medical findings and opinions as to how I feel the current problems are a direct result of the January 24, 1994 injury.
>
> Basically, I saw the patient for the first time on June 5, 1995. The patient at that time gave me the history that he injured his shoulder. I would have to go with the patient's history that he injured it as he states. As for the objective findings, the patient seemed to respond to cortisone injections. We have obtained an MRI that demonstrates tendinitis involving his right shoulder and he has findings on the exam consistent with tendinitis in that he had a positive impingement test and he was tender subacromially.
>
> I hope this provides you with the information that you need.

[¶ 19] The report under N.D.C.C. § 65–05–08.1(2)(b) and (c) (1995) must include information relating to "[w]hether the employee is totally disabled, from any and all employment, or whether the employee is able to return to some employment, including light work or sedentary work," and "[i]f the employee is not totally disabled, a statement of the employee's restrictions and physical limitations." Not only does Dr. MacLeod's letter fail to address these matters, but none of

---

**2.** The Bureau did not furnish Lindell's doctors with the "form" authorized by statute that sets forth the information required by N.D.C.C. § 65–05–08.1(2)(a) through (e) (1995). Preparation of a form for the report listing the required information from the claimant's doctors might allevi-

ate problems in obtaining pertinent information from treating physicians. Nevertheless, the statute does not require the Bureau to prepare a "form," but allows the report to be filed on any form acceptable to the Bureau.

the attached medical records relied on by Lindell speak in terms of any "disability."

[¶ 20] Another disability verification requirement is a "professional opinion as to the expected length of, and reason for, the disability." N.D.C.C. § 65–05–08.1(2)(d) (1995). Even assuming the reason for the disability was established by Dr. MacLeod's letter stating "I would have to go with the patient's history that he injured it as he states," there is no express medical opinion in the record on the expected length of Lindell's disability.

██ [¶ 21] We have construed N.D.C.C. § 65–05–08.1 (1995) as placing "the onus ... on the Bureau to request medical certification of the duration of the claimant's disability, and thereafter the claimant must ensure that the requested reports are filed." *Frohlich*, 556 N.W.2d at 302. In July 1995, a Bureau claims analyst wrote Dr. MacLeod asking him to "outline the expected disability period and return-to-work date" for Lindell. Lindell was copied on this request. In September 1995, a claims analyst wrote Dr. MacLeod asking for his "objective medical findings and opinion as to how you feel the current problems are a direct result of the January 24, 1994 injury." When Dr. MacLeod failed to answer these requests, the Bureau contacted Dr. MacLeod's office by telephone on several occasions requesting a reply. The record also reflects telephone conversations between the Bureau, Lindell and Lindell's attorney about Dr. MacLeod's failure to respond to the Bureau's requests. In November 1995, the Bureau resent the two letters to Dr. MacLeod before finally receiving a response. Under these circumstances, we believe the onus was on Lindell to ensure the requested report was appropriately filed.

[¶ 22] We conclude the Bureau could have reasonably determined from the evidence in the record that Lindell failed to establish the disability verification requirements under N.D.C.C. § 65–05–08.1 (1995).

[¶ 23] Because Lindell failed to establish those requirements, we need not decide whether the Bureau erred in ruling Lindell voluntarily waived disability benefits during the time his family was eligible for AFDC and Medicaid benefits.

[¶ 24] The judgment is affirmed.

[¶ 25] SANDSTROM and NEUMANN, JJ., concur.

MESCHKE, Justice, concurring and dissenting.

[¶ 26] I agree with the majority opinion through paragraph 14. I also agree with the forepart of paragraph 15 describing how the ALJ found Lindell furnished medical evidence establishing a medical basis for his disability.

[¶ 27] The ALJ also found Lindell had "never furnished the Bureau with medical verification that satisfies the statutory requirements at NDCC § 65–05–08.1." I disagree with the ALJ's and the majority's crabbed application of the other statutory requirements and their conclusion Lindell did not satisfy them.

[¶ 28] I would reject TranSystems' argument physician office notes can never be used to satisfy the statutory requirements. Recognizing the limited application of the adversarial concept in a workers compensation setting, we have often held the Bureau must consider the *entire* medical record in evaluating a claim for benefits. *See, e.g., Flink v. North Dakota Workers Compensation Bureau*, 1998 ND 11, ¶ 12, 574 N.W.2d 784. Excluding physician office notes from consideration, when submitted as part of a physician's "report" under N.D.C.C. § 65–05–08.1(2) (1995), would severely elevate form over substance. I would conclude a physician's "report" under the statute includes not only the physician's formal correspondence with the Bureau, but also any submitted medical records referenced in the report. Here, the formal correspondence with the Bureau and attached medical records, when read together, fairly satisfied the statutory requirements for verification of disability.

[¶ 29] The report under N.D.C.C. § 65–05–08.1(2)(b) and (c) (1995) must include information relating to "[w]hether the employee is totally disabled, from any and all employment, or whether the employee is able to

return to some employment, including light work or sedentary work," and "[i]f the employee is not totally disabled, a statement of the employee's restrictions and physical limitations." This information was all evident in the medical reports: Lindell supplied the Bureau with Dr. MacLeod's office notes of August 31, 1995, reporting

> the patient has been unable to use his right arm since we first saw him. Essentially he has been unable to work. I have suggested that he would have to, since we first saw him, avoid using the right arm at work but he could function with the left arm if employment could be found for his left arm. Depending on the findings of the MRI again [sic] will determine which direction we go.

In an office note of September 14, 1995, Dr. MacLeod further said "[w]e will keep [Lindell] going with his present job status of not working hard with the shoulder. He can do light duty but basically no overhead work and no repetitive work." In an August 1996 letter, Dr. Kon–Hweii Lee, a neurologist, said, "[b]ecause of continuing pain, [Lindell] is not able to perform his job as a truck driver which requires using right hand to shift gears."

[¶ 30] Dr. Lee concluded that Lindell suffered from "traumatic tendinitis or bursitis on right shoulder" from his January 1994 injury. A physical therapist who had worked with Lindell reported in October 1995:

> The patient is demonstrating significant deficits in force production capabilities secondary to pain in the shoulder with the greatest differences noted for external rotation and adduction. Pain is a limiting factor making very objective strength determinations very difficult. The patient did appear to be giving a good consistency of effort through each testing speed and all motions.

Although these medical records do not say "disability," they clearly say Lindell was unable to use his right arm and, in turn, clearly recognize Lindell can no longer drive a truck. They specifically stated Lindell was, in statutory language, "able to return to some employment, including light work," though not his former job.

[¶ 31] The plain meaning of what was said was "disability." The medical records relegated Lindell to only "light duty." I would conclude the medical records submitted with medical reports adequately met the requirements of N.D.C.C. § 65–05–08.1(2)(b) and (c) (1995) and showed Lindell's physical limitations and disability as a truck driver.

[¶ 32] The Bureau argues Lindell nevertheless failed to satisfy the disability verification requirements because there was no "professional opinion as to the expected length of, and reason for, the disability." N.D.C.C. § 65–05–08.1(2)(d) (1995). The reason for the disability was established by Dr. MacLeod's November 20, 1995 letter report to the Bureau:

> Basically, I saw the patient for the first time on June 5, 1995. The patient at that time gave me the history that he injured his shoulder. I would have to go with the patient's history that he injured it as he states.

Absent contrary evidence, this clearly gives the reason for Lindell's disability. Although there was no detailed opinion about the expected length of Lindell's disability by days, months or years, it was clear from the medical record that Dr. MacLeod was simply unable to give a precise opinion about when the disability would end.

[¶ 33] The reasons why were evident. Lindell was undergoing continuing treatment, but it was not improving his condition. Dr. MacLeod referred Lindell to a neurologist for his "persistent pain," before undergoing the further option of surgery. The referral was prompted by the results of a surface EMG by a physical therapist showing Lindell's "impingement syndrome on the right may be mechanical, with muscle dysfunction resulting in an inability to perform painfree [range of motion]." The physical therapist noted the evaluation "highlights include extremely low activity of the right intraspinatus, initially, which quickly fatigued to almost no activity." These records fairly show continued treatment of some type was needed and, until an effective remedy could be developed for Lindell, Dr. MacLeod would keep

Lindell on his present status of "light duty" with no overhead or repetitive work.

[¶ 34] When a physician is unable to fix the length of disability because medical professionals have been unable to develop a treatment that is expected to be effective, and when maximum medical improvement is still problematic, I do not believe the Bureau can reasonably require the length of disability to be stated more exactly. Under these circumstances, the obvious import of the report that Lindell could not work until an effective treatment remedy was developed sufficiently satisfied the statutory need to verify the expected length of disability. While the Bureau can prescribe the form of the doctor's report, it cannot prescribe impossible or unprofessional predictions.

[¶ 35] Moreover, the statute places "the onus ... on the Bureau to request medical certification of the duration of the claimant's disability, and thereafter the claimant must ensure that the requested reports are filed." *Frohlich v. North Dakota Workers Compensation Bureau*, 556 N.W.2d 297, 302 (N.D. 1996). Subdivision 1 of N.D.C.C. § 65–05–08.1 (1995) directs the claimant's doctor to "certify the period of temporary total disability *upon request of the bureau*." (My emphasis). A Bureau claims analyst wrote Dr. MacLeod asking him to "outline the expected disability period and return-to-work date" for Lindell. When Dr. MacLeod finally answered several months later, he ended his November 20, 1995 letter by saying, "I hope this provides you with the information that you need." If the Bureau believed that report and the medical records submitted did not yet adequately apprise it of the extent of disability and the expected disability period, the Bureau had a duty to request clarification from Dr. MacLeod, and should have done so.

[¶ 36] To conclude as the ALJ did, that Lindell medically demonstrated his disability, but that he must lose all disability benefits because Lindell's doctor failed to answer in a form the Bureau never prescribed or demanded, is unjust. Under these circumstances, I would conclude the Bureau misapplied N.D.C.C. § 65–05–08.1 (1995) and could not have reasonably determined from the evidence in the record that Lindell failed to establish all of the statutorily required disability verification.

[¶ 37] In this appeal, Lindell sought disability benefits effective June 12, 1995, when he first requested those benefits. Because Lindell has not here sought benefits for the time before June 12, 1995, when his family was eligible for AFDC and Medicaid benefits, I agree with the majority, although for different reasons, we need not decide whether the Bureau erred in ruling Lindell voluntarily waived disability benefits for that earlier period.

[¶ 38] I would reverse the judgment and direct remand to the Bureau to determine the appropriate amount of disability benefits for Lindell. Therefore, I respectfully dissent.

[¶ 39] MARING, J., concurs.